Nos. 24-1072, -1125

IN THE

# United States Court of Appeals for the Federal Circuit

REX MEDICAL, L.P.,

*Plaintiff-Appellant,*

*v.*

INTUITIVE SURGICAL, INC., INTUITIVE SURGICAL OPERATIONS, INC., INTUITIVE SURGICAL HOLDINGS, LLC,

*Defendants-Cross-Appellants.*

On Appeal from the United States District Court for the
District of Delaware
No. 1:19-cv-00005-MN, Hon. Maryellen Noreika

## NON-CONFIDENTIAL OPENING AND RESPONSE BRIEF OF DEFENDANTS-CROSS-APPELLANTS INTUITIVE SURGICAL

George Lombardi
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601

Michael R. Rueckheim
WINSTON & STRAWN LLP
255 Shoreline Drive, Suite 520
Redwood City, CA 94065

Claire Fundakowski
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, DC 20036

Melanie L. Bostwick
Samantha M. Leff
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 339-8400

E. Joshua Rosenkranz
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Lauren A. Weber
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, WA 98101

*Counsel for Defendants-Cross-Appellants*

## CLAIM LANGUAGE AT ISSUE

### U.S. Patent No. 9,439,650: Claims 4-6 (4 and 5 invalidated)

**4 (invalidated).** An apparatus for stapling tissue, comprising:

> a first jaw and a second jaw, at least one of the first jaw and the second jaw being movable with respect to the other of the first jaw and the second jaw from a first configuration in which the first jaw and the second jaw are separated from each other at a first distance to receive tissue and a second configuration in which the first jaw and the second jaw are clamped together at a second distance to hold tissue therebetween for stapling,

> a staple carrying portion of the first jaw defining slots through which staples are configured to pass;

> an anvil surface defined on the second jaw opposing the first jaw;

> at least one of a gear and a cable operatively coupled to at least one of the first jaw and the second jaw and configured to move at least one of the first jaw and the second jaw from the first configuration to the second configuration such that the first jaw and the second jaw are in alignment; and

> a staple pusher configured to cause a staple to move from a first position at least partially within the staple carrying portion to a second position entirely outside the staple carrying portion, the second distance and the alignment being maintained by a beam configured to engage the first and second jaws from within the first and second jaws while tissue is stapled from a proximal location to a distal location.

**5 (invalidated).** The apparatus of claim 4, wherein the beam is configured to engage the first and second jaws one of entirely or substantially from therewithin to maintain the second distance and the alignment.

**6.** The apparatus of claim 5, wherein the beam comprises an upper portion and a lower portion and a web coupled between the upper

portion and the lower portion, at least one of the lower portion or the upper portion configured to cause the staple pusher to move a staple as the beam moves from a proximal location to a distal location, the upper portion and the lower portion configured to cooperatively engage the first jaw and the second jaw to align the slots with a staple forming portion on the anvil surface.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 24-1072, -1125 |
| **Short Case Caption** | Rex Medical, L.P. v. Intuitive Surgical, Inc. |
| **Filing Party/Entity** | Intuitive Surgical, Inc.; Intuitive Surgical Operations, Inc.; Intuitive Surgical Holdings, LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: April 1, 2024

Signature:  /s/ Melanie L. Bostwick

Name:  Melanie L. Bostwick

**iii**

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Intuitive Surgical, Inc. | | None |
| Intuitive Surgical Operations, Inc. | | Intuitive Surgical, Inc. |
| Intuitive Surgical Holdings, LLC | | Intuitive Surgical, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**iv**

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☑  Additional pages attached

| See Attached | | |
|---|---|---|
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)     ☐  No     ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## Attachment

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Shaw Keller LLP: Karen E. Keller, Nathan R. Hoeschen; David M. Fry

Winston & Strawn LLP: Joseph C. Masullo; Kelly C. Hunsaker; Evan Lewis; Gregory J. Winter; Kathi Vidal; Steven M. Anzalone

# TABLE OF CONTENTS

**Page**

CLAIM LANGUAGE AT ISSUE...............................................................i

CERTIFICATE OF INTEREST ............................................................iii

TABLE OF AUTHORITIES ...................................................................x

STATEMENT OF RELATED CASES ..................................................xiv

INTRODUCTION...................................................................................1

STATEMENT OF JURISDICTION......................................................4

STATEMENT OF THE ISSUES...........................................................4

STATEMENT OF THE CASE ...............................................................5

    Intuitive Develops The Innovative SureForm Stapler For
        Use With Its Pioneering Robotic Surgery Platform. ..............5

    Rex Medical, Which Has Never Tested Or Produced A
        Surgical Stapling Product, Obtains The '650 Patent
        Covering Tissue-Stapling Technology. ................................13

    Rex Wields The '650 Patent In Litigation, But The Patent
        Trial And Appeal Board Largely Invalidates It. ..................21

    The District Court Issues Several Consequential Rulings In
        The Lead-Up To Trial. .........................................................24

    Following A Jury Verdict, The District Court Denies
        Intuitive's Motion For Judgment As A Matter of Law
        But Remits The Damages To $1 Based On Rex's
        Failure Of Proof...................................................................28

SUMMARY OF ARGUMENT ................................................................32

STANDARD OF REVIEW....................................................................37

ARGUMENT ........................................................................................38

    I.    The District Court Should Have Granted Judgment Of
        Non-Infringement As A Matter Of Law. .............................38

        A.    Under the Correct Construction of "Lower Portion,"
            It Is Undisputed That Intuitive Does Not Infringe.....42

1. The "lower portion" of claim 6's beam is the bottom end of the beam running horizontally.... 42

2. The district court misconstrued "lower portion."............................................................. 48

3. Rex's only infringement theory fails under the proper claim construction. ................................... 51

B. Even accepting the district court's construction, no substantial evidence supports a finding that SureForm meets the "configured to cause" limitation. ...................................................................... 54

II. If The Infringement Verdicts Stands, Claim 6 Is Invalid As A Matter Of Law Under § 112(a). ....................... 58

A. The full scope of the claims must be described within the four corners of the patent............................ 59

B. No substantial evidence supports a finding that a shuttle configuration is described by the patent......... 61

C. The district court legally erred in denying judgment as a matter of law on this ground. .............. 65

III. Rex Failed to Prove Its Entitlement To Damages And Should Not Get A New Trial.................................. 68

A. The district court acted within its discretion by excluding Mr. Kidder's testimony on the Covidien license because he failed to apportion. ...................... 69

B. The district court correctly remitted damages to $1 because Rex failed to prove a greater royalty. ............ 78

C. The district court acted within its discretion by denying a new damages trial, given Rex's failure of proof and strategic choices.......................................... 85

CONCLUSION ..................................................................... 92

CERTIFICATE OF COMPLIANCE

## **Statement Regarding Confidential Material Omitted**

Pursuant to Federal Circuit Rule 25.1(e) and the stipulated Protective Order entered into on June 27, 2019 (Dkt. 28), two versions of this brief are being filed with the Court: a confidential version that notes the material marked confidential by Rex Medical, L.P. in the district court proceedings, and a nonconfidential version containing appropriate redactions.  In the nonconfidential version of this brief, confidential material has been omitted from page 14 that relates to a third-party licensing agreement.  The confidential material omitted from page 25 relates to Rex's infringement theory.  The confidential material omitted from page 42 relates to an expert's opinion.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.,*
694 F.3d 1312 (Fed. Cir. 2012) ..................................................... 73, 90

*Acumed LLC v. Advanced Surgical Servs., Inc.,*
561 F.3d 199 (3d Cir. 2009) ............................................................ 85

*Amgen Inc. v. Sanofi,*
598 U.S. 594 (2023) ........................................................................ 66

*Apple Inc. v. Motorola, Inc.,*
757 F.3d 1286 (Fed. Cir. 2014) ...................................................... 88

*Apple Inc. v. Wi-LAN Inc.,*
25 F.4th 960 (Fed. Cir. 2022) .................................................... 73, 76

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
598 F.3d 1336 (Fed. Cir. 2010) ....................................... 37, 59, 60, 65

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.,*
672 F.3d 1335 (Fed. Cir. 2012) ...................................................... 56

*Bio-Rad Lab'ys v. 10X Genomics,*
967 F.3d 1353 (Fed. Cir. 2020) .................................................. 77, 89

*Boston Scientific Corp. v. Johnson & Johnson,*
647 F.3d 1353 (Fed. Cir. 2011) ...................................................... 67

*Consol. Ed. Co. v. NLRB,*
305 U.S. 197 (1938) ........................................................................ 58

*Devex Corp. v. Gen. Motors Corp.,*
667 F.2d 347 (3d Cir. 1981) ............................................................ 88

*Ericsson, Inc. v. D-Link Sys., Inc.,*
773 F.3d 1201 (Fed. Cir. 2014) ............................................. 70, 71, 79

*Finisar v. DirecTV Grp., Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008) ............................................. 53

*Finjan LLC v. ESET, LLC*,
   51 F.4th 1377 (Fed. Cir. 2022) .............................................. 37

*Finjan LLC v. SonicWall, Inc.*,
   84 F.4th 963 (Fed. Cir. 2023) ......................................... 70, 74

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) ..................................... 37, 58

*Gentry Gallery, Inc. v. Berkline Corp.*,
   134 F.3d 1473 (Fed. Cir. 1998) ............................................. 64

*In re Giannelli*,
   739 F.3d 1375 (Fed. Cir. 2014) ............................................ 56

*Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*,
   897 F.2d 508 (Fed. Cir. 1990) .............................................. 88

*Helena Lab'ys Corp. v. Alpha Sci. Corp.*,
   274 F. App'x 900 (Fed. Cir. 2008) ....................................... 44

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
   558 F.3d 1368 (Fed. Cir. 2009) ..................................... 49, 66

*Info-Hold, Inc. v. Muzak LLC*,
   783 F.3d 1365 (Fed. Cir. 2015) ............................................ 88

*Intuitive Surgical, Inc. v. Rex Med., L.P.*,
   IPR2020-00152, Paper 9 (P.T.A.B. Apr. 29, 2020) ............. 22

*Intuitive Surgical, Inc. v. Rex Med., L.P.*,
   IPR2020-00152, Paper 35 (P.T.A.B. Mar. 26, 2021) .......... 23

*Intuitive Surgical, Inc. v. Rex Med., L.P.*,
   No. 21-1862 (Fed. Cir. Dec. 9, 2021) .................................. 23

*Jepson v. Coleman*,
   314 F.2d 533 (C.C.P.A. 1963) .............................................. 60

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
    10 F.4th 1330 (Fed. Cir. 2021) ...................................... 60, 65

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
    895 F.2d 1403 (Fed. Cir. 1990) ........................................ 88

*Lockwood v. Am. Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997) .................................... 61, 64

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ........................................ 68

*MLC Intellectual Prop., LLC v. Micron Tech., Inc.*,
    10 F.4th 1358 (Fed. Cir. 2021) ........................................ 73

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) .................................... 44, 45

*O'Reilly v. Morse*,
    56 U.S. (15 How.) 62 (1853) ............................................ 66

*Omega Patents, LLC v. CalAmp Corp.*,
    13 F.4th 1361 (Fed. Cir. 2021) ............................... 37, 80, 81

*Palo Alto Networks, Inc. v. Finjan, Inc.*,
    777 F. App'x 501 (Fed. Cir. 2019) .................................... 50

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................... 43, 44, 47

*Promega Corp. v. Life Techs. Corp.*,
    875 F.3d 651 (Fed. Cir. 2017) .................... 78, 83, 86, 91, 92

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) ........................................ 67

*Rivera v. ITC*,
    857 F.3d 1315 (Fed. Cir. 2017) ......................... 61, 63, 64, 67

*SEC v. Teo*,
    746 F.3d 90 (3d Cir. 2014) ............................................ 38

*TecSec, Inc. v. Adobe Inc.*,
  978 F.3d 1278 (Fed. Cir. 2020) ................................ 78, 84, 88

*Tyson v. Superintendent Houtzdale SCI*,
  976 F.3d 382 (3d Cir. 2020) ............................................. 84

*Univ. of Rochester v. G.D. Searle Co.*,
  358 F.3d 916 (Fed. Cir. 2004) ...................................... 60, 67

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ......................................... 44

*Wi-LAN, Inc. v. Apple Inc.*,
  811 F.3d 455 (Fed. Cir. 2016) ......................................... 49

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ............................................ 37

## Statutes

28 U.S.C. § 1295(a)(1) ...................................................... 4

28 U.S.C. § 1331 ............................................................... 4

28 U.S.C. § 1338 ............................................................... 4

35 U.S.C. § 112(a) .......................... 30, 34, 58, 59, 64, 68

35 U.S.C. § 284 ...................... 36, 68, 78, 87, 88, 89

## STATEMENT OF RELATED CASES

No appeal in or from the same civil action was previously before this Court or any other appellate court. This Court previously decided an appeal between the same parties regarding the Patent Trial and Appeal Board's inter partes review holding most claims of the asserted patent unpatentable: *Intuitive Surgical, Inc. v. Rex Medical, L.P.*, No. 21-1862 (Fed. Cir. Dec. 9, 2021) (per curiam Rule 36 judgment entered by Lourie, Mayer, and Cunningham, JJ.).

Counsel are not aware of any cases in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal, within the meaning of Federal Circuit Rule 47.5(b) and the accompanying practice note.

## INTRODUCTION

Rex Medical insists that this is not an "unusual case." Opening Br. (OB) 4. But in the usual case—indeed, in every case—a patentee must demonstrate that the damages it seeks are properly apportioned to the value of the claimed invention. Rex chose not to do that—and it did so repeatedly. Its expert relied on a third-party license that encompassed not only the patent asserted against Intuitive Surgical here, U.S. Patent No. 9,439,650, but also more than 30 other patents and applications. Yet Rex's expert did not even look at those patents before concluding that they had little or no value in the prior license. Furthermore, while the expert insisted that only two patents in the prior license had any value—the '650 patent and related U.S. Patent No. 10,136,892—he did not attempt to differentiate the relative value, if any, of each to the prior licensee, let alone to Intuitive.

After the district court precluded Rex's expert from testifying about this license, Rex made another unusual choice. It chose to present no expert testimony at all on damages, even though its expert had addressed another supposedly comparable license in his report. Rex instead had its president testify to the same thing its expert was

disallowed from saying: that, because the '892 and '650 patents accounted for the full value of the third-party license, that full value should be attributable to the '650 patent alone here.  Like Rex's expert, this fact witness had no knowledge of the many other patents included in the prior license and no basis to assign the license's full value to the '650 patent.  In these unusual evidentiary circumstances, the district court was right to exclude Rex's expert testimony, remit the damages award to a nominal $1, and deny a new trial for Rex to avoid the consequences of its choices.  This Court therefore can and should affirm the district court's damages rulings.

But the Court need not even reach damages, due to the other unusual features of Rex's litigation strategy.  The '650 patent relates to a surgical tissue-stapling device that relies on an I-beam mechanism to perform several different functions.  But Rex chose to assert the '650 patent against Intuitive's SureForm staplers, which do not use an I-beam to perform all the claimed functions.  Rex therefore had to contort its patent claim to fit the accused products, helped along by the district court's last-minute supplemental claim construction that allowed the "lower portion" of an I-beam to include structures above the bottom

horizontal bar of the "I" shape.  Even with the "lower portion" stretched this way, moreover, Rex's infringement theory depended on a part of the beam being "configured to" perform a claimed function that it does not perform and that a separate component—a shuttle—is specifically designed to perform.  Furthermore, Rex admitted that the '650 patent does not disclose a shuttle, and that a skilled artisan would have to modify the patent's disclosure to add one.

Any one of these issues should have resulted in a judgment in Intuitive's favor.  There is no support for the district court's flawed construction (and Rex cannot show infringement without it); there is no evidence that the beam in Intuitive's devices meets the relevant "configured to" claim limitation; and, to the extent the asserted patent claim is nonetheless stretched to reach Intuitive's beam-and-shuttle configuration, the four corners of the patent specification do not provide written-description support for that configuration.

This Court should either reverse the district court's denial of judgment as a matter of law, or it should affirm the district court's remittitur of the damages award to a nominal $1.

## STATEMENT OF JURISDICTION

The district court had jurisdiction of Rex's patent infringement complaint under 28 U.S.C. §§ 1331 and 1338.  The district court entered final judgment on September 20, 2023.  Appx345.  Rex timely filed a notice of appeal on October 18, 2023.  Appx12118-12119.  Intuitive timely filed a notice of cross-appeal within 14 days of Rex's notice, on October 31, 2023.  Appx12120-12121.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in construing the "lower portion" of a beam to include "additional … structures that extend in a perpendicular direction from the lowermost section of the beam," Appx114-115, and whether Intuitive is entitled to judgment of non-infringement on that basis.

2.  Whether Intuitive is alternatively entitled to judgment of non-infringement because the beam in the accused devices is not "configured to cause a staple pusher to move a staple," as the asserted claim requires, but instead a separate shuttle is configured to do so.

4

3.  Whether, if the infringement verdict stands, Intuitive is entitled to judgment on the ground that claim 6 is invalid, where Rex admits the '650 patent does not disclose a shuttle and that one of skill in the art would have to modify the disclosure to add one.

4.  Whether the district court acted within its discretion in excluding Rex's expert damages testimony regarding a prior license, when the expert made no effort to apportion the license's value to the '650 patent.

5.  Whether the district court correctly remitted the damages award to a nominal $1 because Rex failed to establish any royalty amount, instead presenting a single fact witness who admitted he could not assign a value to the '650 patent.

6.  Whether the district court acted within its discretion in denying Rex's motion for a new damages trial based on Rex's choice not to pursue available alternatives for proving a reasonable royalty.

## STATEMENT OF THE CASE

***Intuitive Develops The Innovative SureForm Stapler For Use With Its Pioneering Robotic Surgery Platform.***

Intuitive Surgical, founded in 1995, pioneered the industry of surgical robotics.  Appx11641-11643.  At the time it was founded,

5

Intuitive focused on developing new applications for technology first created by the nonprofit research institute SRI International, which was intended to allow surgeons to perform remote, robot-assisted surgery on soldiers in battlefields. Appx11417-11418; Appx11643. Intuitive saw an opportunity to use this robotic technology to improve patient outcomes. Appx11417-11418.

Intuitive ultimately developed the da Vinci Surgical System, which has three components: (1) the patient cart, which hovers above the patient and has arms for attaching different instruments or cameras; (2) the surgeon console, which has a three-dimensional viewing screen and controllers for the surgeon to command the instruments; and (3) the vision cart, which allows others inside the operating room to observe the procedure. Appx11644-11645; *see* Appx679; Appx11418-11419. Since its launch in 1999, the da Vinci platform has been used to perform more than 10 million surgeries; worldwide, a da Vinci procedure is performed every 18 seconds. Appx11651; Appx3061-3062.

One surgical instrument that can attach to the da Vinci arms is Intuitive's SureForm stapler, which Intuitive released commercially in

2018 after years of development.  Appx11648-11649; Appx11652;

Appx11688.  Depicted below is a SureForm stapler attached to a da

Vinci arm, so that it can be inserted through a cannula into the

patient's body:



Appx12369; *see also* Appx12157 (video depicting SureForm stapler in

more detail).

SureForm's hardware consists of two components: the instrument and the reload cartridge. The instrument comes in different lengths for different surgical applications. Appx12415 (depicting 45mm and 60mm instruments); *see* Appx11638. It has two jaws that clamp around the patient's tissue and can be maneuvered in "[a] 120° cone of articulation"—"a greater range of motion than the human hand"—so the surgeon can precisely position the instrument. Appx12370; *see also* Appx11649. A hinge at the base of the jaws ensures that they remain aligned, "which is the key to maintaining good staple formation." Appx11674-11675.

The reload cartridge contains the stapling mechanisms. Reloads are color-coded based on staple length, so surgeons can choose the correct staple for the thickness of tissue. *See* Appx11687; Appx12333-12334. The reload cartridge is installed in a channel of the instrument's lower jaw, as shown in the photograph below:



Appx12275.

The stapling process is best understood by looking inside the

reload cartridge, as in the image below:



Appx391; *see also* Appx12274 (video depicting stapling process).  The

white element in the middle is an I-beam housed within the instrument;

a cylindrical shaft running through the instrument contacts the center

of the I-beam and pushes it into the jaws.  *See* Appx11665-11666.  The

drawing below depicts the I-beam in isolation:



Appx12450.  The top and bottom horizontal portions of the beam travel

through channels in each jaw.  Appx11672; *see* Appx4947-4950.

The circular portion in the center of the beam contacts a

corresponding shape on the back of a wedge-shaped shuttle.

Appx11670-11671; *see also* Appx11620-11621; Appx2431; Appx5350.

The shuttle is the yellow wedge in the image of the reload cartridge

above, and is depicted in isolation below:



Appx12456; Appx11670-11671.  The shuttle is specially designed to

receive the force from the I-beam and "translate that motion 90

degrees" to push the staple pushers (the small yellow elements in the

picture of the reload cartridge above) upward with sufficient force into

the anvil surface of the upper jaw to form staples through the patient's

tissue.  Appx11666-11667; *see also* Appx12274 (video).  The shuttle also

contains a "tiny surgical knife" to cut the tissue after stapling.

Appx11664-11665.

The SureForm technology has several important safety features.

One is a "lock out" mechanism in the instrument that "prevents the use

of the device if there is either no reload present or … the reload has

been fired."  Appx11673.  When no reload is present, or when the reload

is spent and the shuttle has moved all the way forward, the lock-out

mechanism will be in a downward position.  Appx11673.  A trapezoidal

portion on the "central spine" of the I-beam "contact[s] the lock out to

prevent forward motion." Appx11673-11674. When an unused reload

cartridge is inserted, however, "the back of the shuttle is configured to

push this lock out up," allowing the I-beam to move forward.

Appx11673. In the picture below, the lock-out (the red element) is in

the up position because an unused reload is present:



Appx11920. The lock-out mechanism is important because, if the I-

beam moves through tissue without staples present, "you cause

uncontrolled bleeding." Appx11714.

Another safety feature is embodied in SureForm's software, which

controls the overall operation of the stapler. Intuitive designed a

software-driven technology called SmartFire to help surgeons ensure

that they have the right size of staple for the tissue involved. "[W]hen

the surgeon first clamps down on tissue" with the SureForm stapler, "it will give an indication as to whether the tissue is too thick, and it will tell the surgeon, don't fire, it's too thick." Appx11649-11650; *see* Appx11653. Then, as the instrument fires, "it's measuring constantly the force it's taking to fire"; if SmartFire detects a potential problem, it will "give the surgeon a warning, and it will slow down or stop" the stapling process as necessary. Appx11650; *see* Appx11741.

SureForm's innovative safety and performance features have made it a popular choice among surgeons. *See, e.g.*, Appx3111-3114.

### Rex Medical, Which Has Never Tested Or Produced A Surgical Stapling Product, Obtains The '650 Patent Covering Tissue-Stapling Technology.

Rex Medical was founded in 1999 by Dr. James McGuckin in partnership with a venture capitalist. Appx3830. Since that time, Rex has been funded principally by investments from its co-founders. Appx11698-11700. Although it has offered some commercial products, sales have been "de minimis." Appx11698; *see also* Appx11699 ("The company just continues to consume cash because it doesn't have enough ongoing sales to make it profitable.").

CONFIDENTIAL MATERIAL OMITTED

Rex has instead tried to make money through patent licensing and litigation.  Much of this activity has involved patents related to tissue-stapling technology, even though Rex has never attempted to produce or even test a tissue-stapling product.  Appx11444; Appx11481-11482.  Even before Rex was founded, Dr. McGuckin in 1997 licensed certain patent rights in endoscopic tissue stapling to Boston Scientific.  Appx12434-12444; *see* Appx3071-3074.  The hope that Boston Scientific would commercialize the patent rights and ▮▮▮▮▮▮▮ [third-party licensing agreement information] did not materialize, however; by 2001, Boston Scientific terminated work on the project and then returned the patent rights to Dr. McGuckin, having ▮▮▮▮▮ [third-party licensing agreement information] only the ▮▮▮▮▮▮▮ [third-party licensing agreement information].  Appx3074-3076; Appx3854-3856; Appx11444-11446.

Around the same time, Rex was working on the application that would lead to the patent asserted here: U.S. Patent No. 9,439,650.  The '650 patent issued in 2016, but it claims priority to a provisional application filed in 2001 by Dr. McGuckin and co-inventor Peter Hinchliffe.  Appx422; *see* Appx11484-11486; Appx11488-11489.  The patent "relates to endoscopic devices for performing localized resections of gastro-esophageal lesions."  Appx435 1:22-24.  The specification

acknowledges that "[e]ndoscopic surgical stapling apparatus are known in the art and are utilized to provide a variety of surgical procedures." Appx435 1:28-30. But the patent does not identify any shortcomings of those prior-art staplers or any specific improvement the inventors sought to achieve. Indeed, Dr. McGuckin testified that he was "not versed in other people's designs, so I don't know what they chose to do." Appx11702.

As described by the Summary of the Invention and depicted in the "illustrative embodiment" of Figure 1, the '650 patent contemplates "a system for stapling tissue" that includes both an endoscope that "provid[es] remote vision of an operative area" and a "surgical stapling apparatus." Appx435 1:54-56, 2:7-8; Appx436 3:37-43; *see* Appx424. Figure 3, reproduced below, depicts the stapling apparatus in more detail:



F I G. 3

Appx427.  Both the endoscope and the stapling apparatus are meant to be inserted into a patient's body through the esophagus.  Appx436 4:24-28; *see also* Appx11398-11399.  The handle (element 12) remains outside the body to allow for control of the stapling apparatus, while the opposable jaws (elements 17) of the stapling assembly (element 16) receive the patient's tissue and clamp it for stapling and cutting.  *See* Appx424-426.  One of the jaws is a "staple carrying portion" (element 40), and the other is a "staple forming portion" (element 50).  Appx436 3:64-65.

The patient's tissue is brought between the jaws using, for example, a separate "grasping device" like the one pictured as element 30 in Figure 2c.  Appx426; *see* Appx436 3:43-46, 4:35-46.  Once the

tissue is in place, the jaws are first "grossly approximated" and then "finely approximated." Appx436 4:55-59. The patent describes gross approximation using an "actuation cable," which Figure 3 above depicts as element 44 and Figure 12 shows in more detail:



F I G. 12

Appx431. This actuation cable is "secured" to one of the jaws and is "operatively coupled" to the other jaw by element 85, "which may, for example, be a spindle, capstan or other member around which the cable 44 passes to change direction to generate the clamping force to draw the jaws together." Appx436-437 4:63-5:3. The actuation cable travels through the stapling assembly and is controlled by "an actuator knob" (element 38), as shown in Figure 3 above. Appx436 4:59-63.

The jaws are then finely approximated—that is, "a tissue contacting surface of the staple carrying portion 40 and a tissue contacting surface of the staple forming portion 50 are brought into cooperative alignment, tightly clamping the tissue therebetween." Appx437 5:15-19. The patent specification describes two mechanisms for accomplishing this fine approximation. The first involves a "clamping member" that moves along the outside of the jaws while a "radially depending driving stem" inside drives the stapling process. *See* Appx428 (Figs. 5-7); Appx432 (Figs. 16-18); Appx437 5:7-23, 6:1-20.

The other mechanism is an "I-beam member," depicted as element 70 in Figure 13 below:



F I G. 13

Appx431. The I-beam member "includes upper and lower beam portions 82a, 82b, respectively, connected by a central web portion 84." Appx437 5:45-47. The leading edge of the central web portion, labeled element 84a, "may preferably define a cutting blade for incising tissue" as the I-beam moves. Appx437 5:47-50. Movement of the I-beam is controlled using one of the handles of the stapling apparatus, as depicted in Figures 8 through 10:



FIG. 8

FIG. 9

FIG. 10

Appx429. Actuating handle 12b in the direction of the arrow shown at the left of Figure 8 causes a gear rack (element 72a) to rotate a gear (element 72b), thus rotating a "staple driving drive cable" (element 74)

that extends through to the jaws of the stapling assembly. Appx437 5:36-42. The cable turns a drive screw (element 76) that "drives a flexible pusher 80 coupled to the I-beam member 70." Appx437 5:41-43.

Figure 15, reproduced below, depicts the I-beam "mov[ing] through the stapling assembly 16 to sequentially fire arcuate rows of staples while simultaneously cutting tissue away from the esophagus." Appx437 6:22-26.



F I G. 15

Appx431. As the patent explains, "[t]he sloped leading edge of the upper beam portion 82a contacts sequentially each of a plurality of staple pushers 118," thus driving the staples through the slots of the staple-carrying portion (element 40), through the clamped tissue, "and into the staple forming pockets 122 formed in the staple forming surface

50a of the staple forming portion 50." Appx437 6:27-35; Appx11494. The cutting blade on the central web of the I-beam "trails the stapling action," cutting tissue after it has been stapled. Appx437 6:37-40.

The '650 patent concludes with several apparatus claims tracking the specification's disclosure. Appx438-439. As discussed below, most of these claims have been invalidated.

### *Rex Wields The '650 Patent In Litigation, But The Patent Trial And Appeal Board Largely Invalidates It.*

In 2019, Rex pursued two litigation campaigns using the '650 patent and related U.S. Patent No. 10,136,892, which shares a specification with the '650 patent and claims priority to the same 2001 provisional application. *See* Appx379-380; Appx441-458. One suit targeted Covidien, an affiliate of Medtronic, accusing four stapling systems of infringing Rex's patents. *See* Appx4; Appx11452; Appx3081. In April 2020, the parties entered into a settlement agreement under which Rex granted Covidien a non-exclusive license to its portfolio of surgical stapling patents for a fee of $10 million. Appx12140-12154. The case settled early, before the claims had even been construed. Appx3470. And shortly before reaching the settlement agreement, Rex

21

had narrowed its infringement allegations and was asserting only the

'892 patent, not the '650 patent. Appx3081.

Rex also filed this litigation against Intuitive in January 2019.

Appx350. As with the Covidien litigation, Rex originally asserted both

the '650 and the '892 patents against Intuitive. Appx375. Unlike

Covidien, however, Intuitive did not settle. It instead challenged Rex's

asserted patents by filing petitions for inter partes review with the

Patent Trial and Appeal Board. *See* Appx1414-1417. A few days after

Intuitive filed the petition challenging the '892 patent, Rex withdrew

that patent from this case; the parties stipulated to dismissal of the '892

patent from the district court litigation, Appx583-584, and the Board

granted the parties' joint request to terminate the agency proceeding

before reaching an institution decision.

The Board proceeded with its review of the '650 patent, however,

and instituted inter partes review in April 2020. *Intuitive Surgical, Inc.*

*v. Rex Med., L.P.*, IPR2020-00152, Paper 9 (P.T.A.B. Apr. 29, 2020)

("'650 IPR"). The district court then stayed this case pending the

outcome of the Board's proceeding. Appx357. The Board ultimately

issued a final written decision holding most challenged claims of the

'650 patent unpatentable. '650 IPR, Paper 35 (P.T.A.B. Mar. 26, 2021).

In particular, the Board agreed with Intuitive's demonstration that the

prior art rendered obvious a tissue-stapling apparatus with two

opposing jaws, one carrying staples and one providing an anvil surface

for forming staples, that could be operated using a cable-drive system

and that employed an I-beam traveling within the jaws to maintain

alignment. *Id.* at 14-33.

The Board upheld only five dependent claims of the '650 patent:

claims 6, 7, 8, 19, and 21. *Id.* at 100.[1] Each of those claims includes a

limitation that requires one of the end portions of the beam—that is,

either the upper or lower horizontal portions of the "I" shape—to be

"configured to cause" (or "to enable") the firing of staples. The Board

did not find this limitation absent from the prior art, however; indeed, it

did not address this limitation at all.

This Court summarily affirmed the Board's rulings. *See Intuitive*

*Surgical, Inc. v. Rex Med., L.P.*, No. 21-1862 (Fed. Cir. Dec. 9, 2021)

(Rule 36 judgment).

---

[1] Intuitive did not challenge claims 1-3 or 25-30. '650 IPR, Paper 35 at
100.

23

***The District Court Issues Several Consequential Rulings In The Lead-Up To Trial.***

Following the inter partes review, the district court litigation proceeded with Rex asserting only claim 6 against Intuitive.  Appx1908; Appx8149.  Shortly before trial in October 2022, the district court made several rulings that drove how the trial played out.

The first was a set of supplemental claim constructions.  Although the district court had issued a *Markman* order earlier in the case, Appx1895-1907, it requested supplemental briefing on certain claim terms during the pretrial conference.  Appx10571-10572; Appx10497. One term in dispute was the requirement of "at least one of a gear and a cable operatively coupled to at least one of the first jaw and the second jaw." Appx438 8:19-20.  As explained above (at 16-17, 19), the '650 patent describes various gears and actuation cables that are joined together mechanically and allow manipulation of the handles of the device to drive movement of the jaws.  *See also* Appx10698-10701. Intuitive's SureForm products do not have this arrangement, however. So Rex's infringement theory relied on the fact that a drive cable in Intuitive's device causes the I-beam to move forward and through the jaws.  *See* Appx10701-10702.

CONFIDENTIAL MATERIAL OMITTED

Rex's infringement theory similarly had to account for the fact that, unlike in the '650 patent, the I-beam in Intuitive's products does not drive the staple pushers—the shuttle does.  *See supra* 11.  And the shuttle, as described above (at 10-11), is pushed by a force applied at the center of the vertical I-beam.  But claim 6 recites that the "lower portion" of the I-beam is both "configured to cooperatively engage" the jaws and "configured to cause the staple pusher to move a staple."  Appx438 8:40-42, 44.[2]  Rex therefore pointed to the small trapezoidal portion of the I-beam that is designed to interface with the lock-out mechanism:



annotated graphic of I-beam

---

[2] Claim 6 alternatively contemplates that the "upper portion" of the I-beam is configured in this way, Appx438 8:40-42, but because the staples and staple pushers are on the lower jaw of the SureForm device, the parties focused on the term "lower portion."

Appx10600.  Rex theorized that, because this portion contacts the shuttle when the lock-out is out of the way, it is "configured to cause" the critical movement.  *See* Appx10703.  Moreover, because the claim assigns two different roles to the "lower portion" of the beam, Rex had to stretch the term to encompass more than just the lower horizontal bar of the I-beam, which engages the jaws, and extend up the spine of the beam as shown below:



Appx11917.

On the morning that trial began, the district court issued supplemental claim constructions that effectively resolved these infringement disputes in Rex's favor.  Appx11057.  While purporting to give "operatively coupled" its "ordinary meaning," the district court

"clarif[ied]" that this term can include arrangements in which the gear or cable connects to the jaws only "through a series of intermediary structures." Appx11386. Similarly, the district court held that the "lower portion" of the claimed beam "may include additional materials or structures that extend in a perpendicular direction beyond the lowermost section of the beam." Appx11387-11388.

The second key pretrial ruling concerned damages. Rex's damages expert, Douglas Kidder, had relied on two allegedly comparable licenses to inform his opinion about the hypothetical negotiation for a reasonable royalty: (1) the 1997 agreement between Dr. McGuckin and Boston Scientific (*see supra* 14); and (2) the 2020 settlement agreement between Rex and Covidien (*see supra* 21-22). Appx3852. Intuitive had filed a *Daubert* motion challenging Mr. Kidder's reliance on the Covidien license for failure to apportion. After taking up the issue at the pretrial conference, the district court granted Intuitive's motion. Appx4-6.

As the district court explained, the Covidien license covered: (1) the '892 patent, which was the only one asserted against Covidien at the time the case settled; (2) the '650 patent; and (3) "eight other U.S.

27

patents, seven U.S. patent applications and nineteen patents or applications from countries outside the United States." Appx4. But Mr. Kidder had attributed the full $10 million value of the license to the '650 patent alone. Appx5; *see* Appx3853-3854. He confessed, however, that he had not reviewed any of the numerous other patents and applications in the license or analyzed whether they covered Covidien's products, Appx6, before opining that they "likely accounted for little-to-no value to Covidien," Appx3854. And he admitted that he did not attempt to "allocate the [lump sum] at all between the '650 and '892 patent[s]." Appx5 (quoting Appx3501) (alterations in original). The district court therefore held that "Mr. Kidder's methods in relying on the Covidien license are unreliable and must be excluded." Appx6.

### *Following A Jury Verdict, The District Court Denies Intuitive's Motion For Judgment As A Matter of Law But Remits The Damages To $1 Based On Rex's Failure Of Proof.*

The district court's pretrial rulings shaped the course of trial. Rex's infringement expert, Mr. Juergens, was able to testify to his expansive reading of key limitations of claim 6 with the imprimatur of the district court's constructions. *See, e.g.*, Appx11572-11574; Appx11578-11579. Meanwhile, Intuitive's expert, Dr. Robert Howe,

testified to the important differences between Rex's patent claim and Intuitive's SureForm product, bolstered by the testimony of Matt Wixey, the lead hardware designer of the SureForm stapler. *See, e.g.*, Appx11664-11666; Appx11668; Appx11670-11676; Appx11712-11718.

The record on damages was unusually thin, however. After unsuccessfully seeking reargument on the district court's *Daubert* ruling, *see* Appx11301-11302, Rex elected not to put on any expert damages testimony. It did not call Mr. Kidder to address the Boston Scientific license, for example, even though the district court had denied Intuitive's motion in limine to exclude that license. *See* Appx3. Instead, Rex's damages case consisted of the testimony of its president, Lindsay Carter, who—like Mr. Kidder—offered no way of distinguishing between the value of the various patents included in the Covidien license. *See* Appx11461-11462; Appx11464-11465; Appx11785-11787. Mr. Carter also had "no knowledge of [Covidien's] sales." Appx11480-11481. And Mr. Carter agreed that, although an expert might be able "to actually assign any value to Rex Medical's '650 patent," he himself could not. Appx11481. Nonetheless, Mr. Carter repeatedly invoked the $10 million license fee paid by Covidien for a portfolio of Rex's patents—

except the one time he blurted out that Rex Medical might "request[] 30 million from Intuitive" in a hypothetical negotiation, an interjection that the district court promptly struck.  Appx11454.

The jury returned a verdict of infringement and awarded Rex $10 million in damages—the unapportioned number it had heard repeatedly from Rex.  Appx11111-11116.

Intuitive sought post-trial relief.  The district court denied Intuitive's motion for judgment of non-infringement as a matter of law, adhering to its pretrial claim constructions and finding sufficient evidence of infringement despite Rex's tenuous theory.  Appx326-331. It also denied Intuitive's motion arguing that, if the '650 patent was broad enough to support an infringement finding, then it was invalid under § 112(a) for lack of written description.  In doing so, the district court relied not on the disclosure of the '650 patent itself but on Mr. Juergens's testimony about what was known in the art at the time. Appx331-334.

As to damages, however, the district court agreed with Intuitive that the jury's $10 million award could not stand.  The district court recognized that, despite having alternative choices, Rex had chosen to

stake its case on the same flawed theory about the Covidien license that
Mr. Kidder was precluded from presenting.  Appx337.  And Mr. Carter
fared no better as a fact witness than Mr. Kidder had as an expert.  His
testimony "fail[ed] to provide any basis from which a factfinder could
assign any portion of the $10,000,000 [Covidien license fee] to the '650
patent alone."  Appx339.  "So, for the same reason the Court precluded
Mr. Kidder from testifying about the license, … the jury could not rely
on the license to determine a reasonable royalty either."  Appx339.
Likewise, the remaining evidence "fail[ed] to provide any basis for a
factfinder to tie a dollar amount to the value of the '650 patent or
support the $10,000,000 award."  Appx340.  Because Rex chose not to
introduce any reliable damages evidence but instead persisted in
relying on the bare fact that another company had paid $10 million for
a portfolio license that included the '650 patent, the district court
denied Rex's request for "a second chance at discovery and trial" and
instead "remit[ted] the jury's award to nominal damages of $1."
Appx340-341.

Rex has appealed from the district court's damages ruling, and
Intuitive has cross-appealed from the liability rulings.

31

# SUMMARY OF ARGUMENT

**I.A.**  The district court erred in construing the "lower portion" of the beam to include additional structures that extend above the lowest horizontal section of the beam—a construction that conflicts with the claim language, the specification, and how a person of ordinary skill would understand the term.  The "beam" recited in claim 6 is an I-beam, resembling the letter "I," with upper and lower portions mirroring the upper and lower bars of the letter and with a vertical web sandwiched between the two.  Consistent with this understanding of three distinct portions, claim 6 differentiates the "lower portion" from other structural components of the I-beam, both nominally and substantively.  Appx438 8:38-46.  And the specification consistently describes only the lowest horizontal portion of the claimed I-beam as the "lower portion" and differentiates its role from the role of the vertical "web."  In the face of this clear and consistent usage, and with no affirmative support in the claim language or specification, the district court erred in construing the "lower portion" to include material that extends above the lower end of the beam running horizontally.

Under the correct construction, Intuitive was entitled to judgment of non-infringement as a matter of law. Rex's infringement theory rested entirely on the district court's incorrect construction. Claim 6 requires the "lower portion" of the beam to be "configured to cause the staple pusher to move a staple," and Rex relied for this limitation on part of the SureForm I-beam that unquestionably sits above the bottom horizontal bar of the "I." Indeed, Rex's expert agreed that, "if you defined lower portion to mean only that lowest portion, there is no infringement." Appx11605-11606.

**I.B.** Even if this Court agrees with the district court's construction of "lower portion," the jury's infringement verdict lacks substantial evidentiary support. The district court's claim construction of the "configured to cause" term requires the "lower portion" of the beam to be "designed, constructed, or set up to cause the staple pusher to move a staple." It is undisputed that, in the SureForm devices, the shuttle (not the I-beam) is designed to (and does) perform this function. Rex's evidence about the trapezoidal portion above the lower horizontal bar of the I-beam showed, at most, that this portion incidentally contacts the shuttle—the component that actually drives the staple

pushers.  And it is undisputed that this trapezoidal portion of the beam is "designed" for a different function: interfacing with the lock-out mechanism.  No reasonable jury could have accepted Rex's infringement theory.

**II.**  If the infringement verdict stands, however, then claim 6 is invalid for lack of written description.  The '650 patent discloses only a configuration where the I-beam directly contacts the staple pushers and causes them to move.  As Rex's expert admitted, there is no description of a shuttle anywhere in the '650 patent.  The '650 patent therefore provides no written description to support a claim that encompasses an I-beam that pushes a shuttle, which in turn drives the staple pushers. The district court's only basis for holding otherwise was legally incorrect.  The district court (and Rex) relied on testimony that shuttles were known in the art, and that a person of ordinary skill would know how to modify the '650 patent disclosure to add a shuttle.  But written-description support must be found in the four corners of the specification; a disclosure that merely renders a modification obvious does not satisfy § 112(a).  Accordingly, to the extent that a beam

configured to move a shuttle that is configured to drive staple pushers is within the scope of claim 6, the claim is invalid.

**III.** If the liability verdict stands, this Court should affirm the district court's damages rulings. First, the district court properly exercised its discretion in excluding Mr. Kidder's testimony on the Covidien license because he failed to apportion the $10 million license fee to Intuitive's use of claim 6 of the '650 patent. Among other things, Mr. Kidder admitted that he made no effort to analyze any of the licensed intellectual property except the '650 and '892 patents before opining that everything else was "likely" worthless. Appx3854. And he did not even approximate any difference between the value of the '650 and '892 patents, instead opining that *either one* provided most of the value of the Covidien license—even though Rex asserted only the '892 patent against Covidien at the time of the license. Thus, Mr. Kidder gave an unreliable opinion that failed to provide any way for a jury to determine how much of Covidien's license fee to attribute to the '650 patent.

The district court also correctly remitted the damages award to a nominal $1 because Rex failed to prove any damages tied to Intuitive's

infringement.  After the district court excluded Mr. Kidder's testimony on the Covidien license, Rex forged ahead with the same invalid damages theory, this time supported by a fact witness who admitted that he had no idea what factors led to the $10 million fee for the Covidien license.  Like Mr. Kidder, Mr. Carter failed to give the jury any way to determine how much of the $10 million Covidien lump sum to attribute to the '650 patent, let alone how to translate that amount to the patent's value to Intuitive.

Finally, the district court properly exercised its discretion in denying Rex's motion for a new damages trial.  Because no trial evidence supports Rex's theory that the '650 patent has a non-zero value, Rex turns to the text of § 284, contending that the statute mandates a new trial for Rex to receive a "reasonable royalty."  But this Court has made clear that § 284 does not provide an escape hatch for a patentee who fails to prove any damages.  And Rex made strategic choices not to introduce other evidence of damages here, such as Mr. Kidder's testimony on the Boston Scientific license.  As the district court explained, there is no reason to save Rex from the consequences of its choices and give it a second shot at proving damages.

## STANDARD OF REVIEW

This Court "reviews a district court's claim construction de novo and its underlying factual determinations for clear error." *Finjan LLC v. ESET, LLC*, 51 F.4th 1377, 1382 (Fed. Cir. 2022).

For procedural issues not unique to patent law, the regional circuit's law controls. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1374 (Fed. Cir. 2021). This Court, applying Third Circuit law, affords "plenary" review to the denial of judgment as a matter of law. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1202 (Fed. Cir. 2010). The jury's infringement verdict is reviewed for substantial evidence; it must be overturned if "no reasonable jury" could find infringement. *Id.* at 1202, 1206. Although written description is a question of fact that is also subject to substantial-evidence review, a verdict based on "legally irrelevant" evidence will not be upheld. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1355 (Fed. Cir. 2010) (en banc).

The Third Circuit reviews for abuse of discretion a district court's decision to exclude expert testimony, *ZF Meritor, LLC v. Eaton Corp.*,

696 F.3d 254, 268 (3d Cir. 2012), and to deny a motion for a new trial,

*SEC v. Teo*, 746 F.3d 90, 97 (3d Cir. 2014).

## ARGUMENT

### I.    The District Court Should Have Granted Judgment Of Non-Infringement As A Matter Of Law.

The jury's infringement finding rested on several errors, but two stand out as representative of the fundamental differences between Rex's '650 patent and Intuitive's SureForm products.  Both errors center on the beam that is key to the '650 patent's alleged invention.

Claim 6 assigns several vital roles to the beam: it maintains the alignment and clamping of the jaws; engages the jaws from within to ensure the staple slots are aligned with the anvil surface; and causes the staple pushers to fire the staples through the patient's tissue as the beam moves through the jaws.  Appx438 8:4-46.  Indeed, Rex told the jury that this "idea of using the I-beam for multiple functions" was core to the '650 patent invention and distinguished it over the prior art. Appx11409.  As Rex's counsel put it, "[w]hen you have the one element that performs multiple jobs, … the invention makes a device that's safer, less prone to failure and again, better outcomes."  Appx11410.

Of course, Rex has never tried to make a device using the '650 patent's approach. And Intuitive, which has been developing safe, reliable surgical technology for decades, did not design its staplers as the patent describes. SureForm includes an I-beam, but that beam does not perform all the roles that claim 6 contemplates. The beam does not maintain alignment of the jaws; the hinge does. *See supra* 8. The beam does not activate the staple pushers; the shuttle does. *See supra* 11. The beam pushes the shuttle, but it does so from its vertical spine, and the shuttle's wedge configuration translates that lateral force into an upward force to push the staple pushers in the right direction. *See supra* 10-11.

To prove infringement, however, Rex needed to show that the "lower portion" of the beam both engages the jaw and is "configured to cause the staple pusher to move a staple." Appx438 8:33-42. Rex took the position that the top and bottom horizontal parts of the I-beam enter channels in the jaws to meet the engagement limitation. Appx11567-11568. But when those horizontal parts are in the channels, they cannot contact the shuttle, and so cannot even indirectly drive the staple pushers. Rex therefore focused on the portion of the

beam's vertical spine that sits above the lower rung of the "I." As described above (at 11-12), and as the undisputed evidence showed, this "little trapezoid," which is 0.033 inches thick, Appx4955, is designed to sit above the channels in the jaw and contact the lock-out mechanism to prevent I-beam movement when no reload (or a spent reload) is present. Appx11673-11674; *see* Appx11619. But because this tiny safety feature touches the shuttle when a new reload is present, and because the shuttle drives the staple pushers, Rex took the position that the "little trapezoid" is "configured to cause a staple pusher to move a staple."

There are two main problems with Rex's theory. First, the "little trapezoid" is not part of the "lower portion" of the I-beam; it sits on the vertical spine and is distinct from the actual "lower portion" that engages the lower jaw. The district court erred by construing "lower portion" to encompass "material or structures that extend in a perpendicular direction beyond the lowermost section of the beam." Appx11057. That construction has no basis in the patent, which clearly and consistently distinguishes between the I-beam's horizontal and vertical portions and the roles each plays. Without this flawed

40

construction, all agree that Rex cannot show infringement. *Infra* Part I.A.

Second, the "little trapezoid" is not "configured to cause the staple pusher to move a staple." The district court's construction of that term, which Intuitive is not challenging on appeal, requires an element that "is designed, constructed or set up to cause the staple pusher to move a staple." Appx1902. That is undisputedly not the design of the "little trapezoid." And it *is* the design of a different component: the shuttle. While Rex told the jury that intent did not matter, that argument is contrary to the claim construction and this Court's precedent. And, on this record, no reasonable jury could have concluded that the force applied by the "little trapezoid" is sufficient to say that this element drives the shuttle's interaction with the staple pushers, as Rex contended. *Infra* Part I.B.

For both reasons, the district court should have granted judgment of non-infringement as a matter of law.

**CONFIDENTIAL MATERIAL OMITTED**

A.    **Under the Correct Construction of "Lower Portion," It Is Undisputed That Intuitive Does Not Infringe.**

1.    **The "lower portion" of claim 6's beam is the bottom end of the beam running horizontally.**

Everyone now agrees that the "beam" recited in claim 6 is an I-beam. The '650 patent consistently refers to only one type of beam—an I-beam. *See* Appx435 2:60-61; Appx437 5:36-50; Appx437 6:21-36. Rex now agrees that the device described in the patent "includes a multi-functional I-beam." OB5; *see also, e.g.*, Appx11409 (Rex's counsel telling the jury that "[t]here is a structure in [claim 6] called an I-beam"). *But see* Appx10601 n.2 (Rex previously arguing that the I-beam is "an

expert's opinion

█████████████████████"). And both parties' experts described the beam as such at trial. *See, e.g.*, Appx11728 (Intuitive's expert, Dr. Howe); Appx11609 (Rex's expert, Mr. Juergens). *But see* Appx10630 (Mr. Juergens initially opining that the patent's I-beam disclosure is

expert's opinion

"█████████"). Rex's expert also agreed that, "[i]n a classic I-beam, it's shaped like the letter I," with two horizontal portions joined by a vertical portion. Appx11609-11612. And claim 6 plainly describes the beam having this classic form: "the beam comprises an upper portion

42

and a lower portion and a web coupled between the upper portion and the lower portion." Appx438 8:38-40.

The claim's reference to the "lower portion" of the I-beam therefore must mean the lower bar of the "I" shape. As Intuitive put it in the supplemental claim construction briefing the district court ordered shortly before trial, a person of ordinary skill "would understand that the 'upper' and 'lower portion' refer to the ends of the beam running horizontally, while the 'web' refers to the vertical portion connecting the two." Appx10703. The district court should have adopted that straightforward understanding of "lower portion."

First, claim 6 itself compels this construction. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). As noted above, claim 6 recites three distinct structural components of the beam: (1) an "upper portion," (2) a "lower portion," and (3) a "web coupled between" the two. Appx438 8:38-40. And the claim substantively differentiates these components, with each playing a particular role. For example, claim 6 defines the "upper portion and the lower portion" as being "configured to cooperatively

43

engage the first jaw and the second jaw." Appx438 8:43-45. And "at least one of the lower portion or the upper portion" must be "configured to cause the staple pusher to move a staple." Appx438 8:40-42. The web, meanwhile, is "coupled between the upper portion and the lower portion." Appx438 8:39-40. In other claims, the web has its own function; claim 7, which Rex originally asserted against Intuitive, recites "[t]he apparatus of claim 6, further comprising a cutting blade on the web." Appx438 8:47-48. These "separately claimed" terms cannot be interpreted in a way that "blur[s] the distinction" between them. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1302 (Fed. Cir. 2005); *see also, e.g.*, *Helena Lab'ys Corp. v. Alpha Sci. Corp.*, 274 F. App'x 900, 902 (Fed. Cir. 2008) (claim language "compels" distinction between "separately claimed structure[s]").

Second, the specification confirms this distinction between the three parts of the beam and demonstrates that the "lower portion" is only the lowest horizontal portion of the "I" shape. *See Phillips*, 415 F.3d at 1321 ("[T]he specification is 'the single best guide to the meaning of a disputed term ....'" (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996))). The figures

44

that depict the beam consistently illustrate the classic "I" shape. *See* Appx430 (Fig. 11); Appx431 (Figs. 13, 14, 15). And, as the highlighted versions of Figures 13 and 14 below show, they clearly label the "upper portion" (element 82*a*) as the topmost horizontal segment; the "lower portion" (element 82*b*) as the bottommost horizontal segment; and the "web" (element 84) as the entire vertical segment:



Appx10702; *see also* Appx437 5:45-47. These "three separate, differently named and labeled components" must be understood as three distinct things. *NTP*, 418 F.3d at 1303.

The clear delineation between the horizontal and vertical portions of the I-beam is reinforced by the specification's description of the stapling process. As shown in Figure 13, above, and in Figures 11 and 15, the upper and lower portions of the beam travel through channels in the jaws as the beam moves through. *See* Appx430-431. That is how

45

the upper and lower portions "cooperatively engage the first jaw and second jaw," as recited in claim 6.  Appx438 8:43-45; *see* Appx10703. And it is how, as the specification describes, one of the upper or lower portions can "contact[] sequentially each of a plurality of staple pushers 118 to drive them through their respective staple slots."  Appx437 6:27-30.



FIG. 15

Appx9816 (Dr. Howe providing annotations).  In contrast, "the central web portion 84 travels" through "an arcuate channel 90" that "is defined in the opposing jaws 17 radially inward of the arcuate lines of staple carrying slots."  Appx437 5:50-53.



F I G. 11

Appx430.

If the upper or lower portion of the I-beam contacts the staple pushers to drive the staples through the staple-carrying slots, and the central web travels through a channel "radially inward" of the staple-carrying slots, then there must be a clear "I" shape to the beam, with a clear delineation between the horizontal and vertical portions. *Cf.* Appx10703 (the "structural requirement" disclosed in the patent "would reinforce" the "understanding that the ends of the beam running horizontally are the 'upper' and 'lower portions'").

That is exactly how a person of ordinary skill would have understood the '650 patent's disclosures. *See Phillips*, 415 F.3d at 1313 ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective bas[is]" for claim construction.). As

47

noted above, both parties' experts have endorsed the view that the '650 patent describes a classic I-beam shape, with "the upper and lower portions" comparable to "the upper and lower perpendicular portions that abut the vertical stem of the capital letter 'I'" and the "central web" comparable to that "vertical stem."  Appx2820-2821 (Dr. Howe, citing supporting dictionary definition); *see* Appx11608-11609 (Mr. Juergens). In that classic shape, only the bottom end, running horizontally, can properly be called the "lower portion."

### 2.    The district court misconstrued "lower portion."

The district court departed from this plain understanding of "lower portion" and instead accepted Rex's "results-oriented interpretation."  Appx10703; *see* Appx11057.  While purporting to give "lower portion" its "plain and ordinary meaning," the court provided the additional gloss that the term "may include additional material or structures that extend in a perpendicular direction beyond the lowermost section of the beam."  Appx11057; *see also* Appx11387-11388. In other words, the district court allowed the "lower portion" to include material that is part of the vertical section running between the two horizontal bars of the "I" shape.  This construction is contrary to both

the intrinsic and extrinsic evidence and is unsustainable under this Court's precedent.

The district court gave no affirmative reason why a person of ordinary skill would interpret the '650 patent to encompass a beam whose "lower portion" can include material above the bottom-most rung of the "I" shape.  Instead, it dismissed Intuitive's contrary showing in one conclusory sentence: "I see nothing in the intrinsic evidence to require narrowing the construction as defendants suggest."  Appx11387.  The district court did not engage with the claim language or the specification, both of which clearly and consistently delineate between the vertical web and the horizontal portions of the beam.  *See supra* I.A.1.  The proper construction of "lower portion" must align with the consistent description and portrayal of the "lower portion" in the '650 patent.  *See, e.g.*, *Wi-LAN, Inc. v. Apple Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1375 (Fed. Cir. 2009).  The district court's construction runs afoul of this principle.

Rex offered nothing to support the reading the district court ultimately adopted.  Rex argued that, in the '650 patent, the upper and

lower portions are the parts of the beam that "do the majority of the work." Appx10601.  To begin with, that is inaccurate; as noted above (at 19), the patent explains that part of the "central web portion 84 may preferably define a cutting blade for incising tissue as the I-beam member 70 is moved distally."  Appx437 5:47-50.  Cutting tissue after it has been stapled can certainly be part of the "work" of a surgical stapler.  *See* Appx437 6:23-26.

More fundamentally, Rex's argument simply ignores the claim language and assumes infringement.  In Rex's view, claim 6 describes certain functions performed by the upper and lower portions of the beam.  So, Rex says, whatever performs those functions must be the "upper portion" or "lower portion" of the beam.  *See* Appx10600-10601.  But the words of a claim have meaning.  The '650 patent's inventors did not claim a beam with "a working portion" that performs certain functions.  They specified that those functions are performed by "the upper portion" or "the lower portion" of the beam.  Rex cannot read those structural limitations out of the claim by arguing that function is all that matters.  *See Palo Alto Networks, Inc. v. Finjan, Inc.*, 777 F.

App'x 501, 506 (Fed. Cir. 2019) (that two components "perform the same function does not show that they are structural equivalents").

Absent any indication in the patent that the "lower portion" may include structures above the beam's lowest horizontal section, and against the backdrop of ample intrinsic and extrinsic evidence demonstrating that the "lower portion" is only the end of the I-beam running horizontally, this Court should vacate the district court's construction and adopt Intuitive's proposed construction.

### 3.   Rex's only infringement theory fails under the proper claim construction.

Under the proper construction of "lower portion" as "the bottom end of the beam running horizontally," Intuitive is entitled to judgment of non-infringement.  The district court's denial of judgment as a matter of law turned entirely on the court's construction of "lower portion" to encompass material that "extends in a perpendicular direction beyond [the] lowermost section" of the beam—in other words, material that is not part of the bottom end of the beam running horizontally.  *See* Appx327.

Rex could not show infringement without the benefit of the district court's flawed construction.  Claim 6 requires that the "lower portion"

be configured to perform two functions: (1) "cause the staple pusher to move a staple," and (2) "cooperatively engage the first jaw and the second jaw."  Appx438 8:41-45.  As the district court recognized, Rex's infringement expert relied on two different "portions" of the SureForm I-beam's alleged "lower portion" to meet these requirements.  Appx327. He identified "the lowermost part" of the I-beam as the part that cooperatively engages the jaws.  Appx328; *see* Appx11579 (testifying that this portion is "buried inside of the jaw").  And he identified the so-called "section of the lower portion … which sticks up into the channel" as the part that "contacts … the sled [that is, the shuttle] which then in turn contacts the staple pusher to move the staple."  Appx327 (quoting Appx11575; *see also* Appx11576-11577 (Rex referring to this as "the protruding piece of the lower portion").  These two different portions of the alleged "lower portion" are shown below:



Appx11917.

There is no dispute that the portion Rex alleges is "configured to cause" does not "cooperatively engage" a jaw and vice-versa. *See* Appx11603 (Mr. Juergens "agree[ing] that" the "lowest most portion of the beam … is not configured to cause the staple pusher to move"); *see also* Appx11575; Appx11578-11580; Appx11604.  Indeed, Mr. Juergens agreed that, "if you defined lower portion to mean only that lowest portion, there is no infringement." Appx11604-11606.  Under the proper construction of "lower portion," therefore, Rex acknowledges it cannot show infringement.  This Court should therefore reverse the district court's denial of judgment as a matter of law and hold that, under the proper construction of "lower portion," Intuitive does not infringe claim 6 of the '650 patent.  *See, e.g., Finisar v. DirecTV Grp.,*

*Inc.*, 523 F.3d 1323, 1333 (Fed. Cir. 2008) ("If no reasonable jury could have found infringement under the proper claim construction, this court may reverse a district court's denial of JMOL without remand.").

**B.    Even accepting the district court's construction, no substantial evidence supports a finding that SureForm meets the "configured to cause" limitation.**

Even if this Court agrees with the district court that the "lower portion" of the beam can include material extending above the bottom-most portion, Intuitive is still entitled to judgment of non-infringement. One of claim 6's requirements is that the "lower portion" be "configured to cause the staple pusher to move a staple." Appx438 8:40-42. The district court construed this term to mean that the relevant portion of the beam "is designed, constructed or set up to cause the staple pusher to move a staple." Appx1902.[3]

There is an element in the SureForm device that is designed to cause the staple pushers to move staples: the shuttle, which is specifically designed to transform the beam's lateral force to create an

---

[3] Intuitive argued that this term should be construed as "shaped to contact the staple pusher to move a staple." *See* Appx1902-1903; Appx854-860. To narrow the issues on appeal, Intuitive is not challenging the district court's construction.

upward force driving the staple pushers.  *See supra* 11; Appx11666.  Mr.

Juergens even acknowledged that this is "[a]bsolutely" what the

"shuttle" is "specifically configured" to do.  Appx11595; *see also*

Appx11632.  But the shuttle is not part of the "beam."

Rex therefore relied on the portion of the I-beam's spine that is

designed to engage the lock-out mechanism, deeming this part of the

"lower portion" of the beam and relying on the fact that, when the lock-

out is out of the way, this portion of the beam contacts the shuttle,

which in turn drives the staple pushers.  *See supra* 10-11; Appx11575-

11576; Appx12033-12034.  As Rex put it, "the protruding portion [of the

I-beam] hits the shuttle at the red circled portions":

 

Appx12034.  But the record contains no evidence from which a

reasonable jury could find that this part of the beam meets the district

court's definition of "configured to cause."

To be "designed to" do something, as the district court's construction requires, it is not enough that an element "can be made to serve that purpose." *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012). Rather, the element must be "meant to" perform the specified function. *Id.*; *see also, e.g.*, *In re Giannelli*, 739 F.3d 1375, 1379-80 (Fed. Cir. 2014). But the jury heard undisputed testimony from Mr. Wixey that the part of the I-beam Rex relied on to meet this limitation was designed for a completely different purpose: "to interface with the lock out" and "prevent forward motion when there is not a reload." Appx11673-11674. In other words, this part of the beam is designed to *stop* movement, not to facilitate it as the claim requires. *See* Appx438 8:40-42.

Mr. Juergens did not dispute how the SureForm device was designed. Instead, he made clear that he was applying a standard that did not require any sort of intentional design but simply that "it does it." Appx11577; *see also* Appx11578 (suggesting that "it doesn't matter" if any contact between the alleged "lower portion" and the shuttle is "accidental"); Appx11619 ("[I]ntent, it does not matter."); Appx11632

("The fact of the matter is the lower portion is contacting and pushing the shuttle.").

Furthermore, Mr. Juergens's infringement opinion was based on the conclusory statement that what he called the "lower portion" "is a significant driving factor in the shuttle." Appx11577. But he later acknowledged it was "difficult to say" how much "this part contribute[s] to the mechanical force" driving the shuttle, as opposed to "the web portions that contacts" the shuttle. Appx11631. Mr. Juergens also admitted that this part of the beam is only "33/1000th of an inch" and that the force driving the beam forward (which causes it to contact the shuttle) is "right in the center of the beam," not at this so-called "lower portion." Appx11618-11621; *see also* Appx11670 (Mr. Wixey explaining that the center of the beam is designed to contact the shuttle). In sum, the record contains no reliable evidence of the extent to which Mr. Juergens's "lower portion" causes the shuttle to move—let alone the extent to which it causes the staple pusher to move a staple, as the claim requires. And the only evidence on what this part of the beam is "designed to" do has nothing to do with the claim language.

In these circumstances, "no reasonable jury" could have found that Intuitive's SureForm devices infringe the "configured to cause" limitation of claim 6. *Secure Computing*, 626 F.3d at 1206; *see Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938) ("Substantial evidence is … such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). For this additional reason, this Court should reverse the district court's denial of judgment of non-infringement.

## II. If The Infringement Verdicts Stands, Claim 6 Is Invalid As A Matter Of Law Under § 112(a).

If this Court upholds the denial of judgment on non-infringement grounds, it should reverse the denial of judgment on written-description grounds. No reasonable jury could find both that claim 6 of the '650 patent encompasses the SureForm product for infringement purposes and that the patent contains adequate disclosure to support such broad claim scope.

Claim 6 recites that either the upper or lower portion of the beam is "configured to cause the staple pusher to move a staple as the beam moves." Appx438 8:40-42. Rex's infringement theory, however, targeted a beam that does not interact with the staple pushers at all,

but rather pushes a separate shuttle that is itself specifically designed to engage the staple pushers.  *See supra* Part I.B.  If claim 6 is broad enough to cover a beam-and-shuttle configuration, then the specification must provide written-description support for such a configuration.

No reasonable jury could find that it does.  Rex acknowledged that a shuttle is not disclosed anywhere in the '650 patent, and its expert testified only that a person of ordinary skill would know how to modify the patent's disclosure to incorporate a shuttle.  That is legally insufficient:  "[A] description that merely renders the invention obvious does not satisfy the [written-description] requirement."  *Ariad*, 598 F.3d at 1352.  To the extent the infringement verdict is upheld, therefore, the verdict that claim 6 is valid under § 112(a) must be reversed.

## A.  The full scope of the claims must be described within the four corners of the patent.

A patent "specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art … to make and use the same."  35 U.S.C. § 112(a).  The

written description part of this requirement "is basic to patent law." *Ariad*, 598 F.3d at 1345.

Critically, whether a patent satisfies the written-description requirement does not turn on "whether one skilled in the art might be able to construct the patentee's device from the teachings of the disclosure of the application." *Jepson v. Coleman*, 314 F.2d 533, 536 (C.C.P.A. 1963). Rather, "the hallmark of written description is disclosure." *Ariad*, 598 F.3d at 1351. The written-description test "requires an objective inquiry into the four corners of the specification" to determine whether a skilled artisan would recognize "that the inventor actually invented the invention claimed." *Id.*; *see also, e.g.*, *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 927 (Fed. Cir. 2004) ("[I]t is in the patent specification where the written description requirement must be met."). This "four corners" inquiry must lead to an understanding "that the inventors possessed the entire scope of the claimed invention." *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1337 (Fed. Cir. 2021).

Because the focus is on the specification itself, "[t]he question is not whether a claimed invention is an obvious variant of that which is

disclosed in the specification." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997). "The knowledge of ordinary artisans may be used to inform what is actually in the specification, but not to teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification." *Rivera v. ITC*, 857 F.3d 1315, 1322 (Fed. Cir. 2017) (internal citation omitted).

### B. No substantial evidence supports a finding that a shuttle configuration is described by the patent.

If the jury's infringement verdict is upheld, then claim 6 must include within its scope not only a configuration in which the beam is "configured to cause the staple pusher to move a staple" by, for example, contacting the pusher directly, but also one in which the beam pushes a separate shuttle component that in turn is designed to drive the staple pushers. That was the sole basis for Rex's infringement theory. *See supra* Part I.B.

But Rex failed to show that the '650 patent specification discloses a shuttle configuration. On the contrary, as noted above, Rex stressed to the jury that the key to the '650 patent invention is to have the beam itself perform "multiple functions," including "caus[ing] the staples to

fire." Appx11409 (referring to this as "the way it's described and claimed in the '650 patent"). And Rex did not even try to show disclosure of a shuttle (or anything like it) within the four corners of the specification.

Instead, Rex and its expert took the exact approach this Court has repeatedly rejected and contended that adding a shuttle would have been obvious to a person of ordinary skill in the art. Mr. Juergens agreed that a shuttle is "a unique part that is different than the beam that's talked about in the claim." Appx11591. And he acknowledged that, "[i]f you read the entire patent word for word, you would see that nowhere in the patent is the word shuttle used." Appx11591. His explanation for how the '650 patent nonetheless contains written-description support for a shuttle was that "shuttles were known at the time" of the patent's priority date. Appx11813. He then testified that a person of ordinary skill could make a "modification[]" to the beam disclosed in the patent to "translate" it "into one with a shuttle." Appx11814. Specifically, Mr. Juergens suggested one could "cut the leading edge of 82(a) off," "maybe" make it "a different size," "and then make it a separate part, that's a shuttle." Appx11814. Element 82a is

the upper portion of the I-beam disclosed in the patent, which has a "sloped leading edge" designed to "contact[] sequentially each of a plurality of staples pushers." Appx437 5:45-47, 6:27-29. Thus Mr. Juergens's testimony amounted to an obviousness opinion: the '650 patent does not disclose a shuttle, but a person of ordinary skill in the art would know to modify the disclosure to include one.

That is not enough to satisfy the written-description requirement. Indeed, Rex's position closely resembles the argument this Court rejected in *Rivera*. There, the patent related to adaptor assemblies to allow consumers to use coffee "pods" in single-brew coffee machines designed to brew from "cartridges." 857 F.3d at 1316-17. The specification consistently described an invention in which a "receptacle or container" could receive a coffee pod. *Id.* at 1321. But the asserted claim recited "a receptacle configured to receive the brewing material" directly, without any pod. *Id.* at 1318. The parties agreed that nothing in the patent "explicitly describe[d]" this "integrated filter" configuration. *Id.* at 1319. But the patentee argued that there was written-description support because "ordinary artisans were aware of the availability of an integrated filter." *Id.* at 1322. This Court

63

disagreed: "That ordinary artisans may have understood that the filter could be incorporated into the cartridge does not save the claims—ordinary artisans would not have understood that Rivera had possession of an integrated filter system." *Id.* at 1323.

Likewise here, while ordinary artisans might have understood that one could incorporate a separate shuttle into Rex's disclosed invention, they would not have understood that Rex was disclosing a "beam plus shuttle" configuration as part of that invention. Whether it was obvious to turn one component into two, as Mr. Juergens suggested—just as it was allegedly obvious to turn two components into one in *Rivera*—is irrelevant. A patentee cannot, consistent with § 112(a), "broaden his claims to the extent that they are effectively bounded only by the prior art." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998). In particular, this Court has found written description absent where "the disclosure, when combined with the knowledge in the art, would lead one to speculate as to modifications that the inventor might have envisioned, but failed to disclose." *Lockwood*, 107 F.3d at 1572. That is the most that the jury

could possibly have concluded from the record evidence, and it is not enough.

Because Intuitive demonstrated that the '650 patent does not disclose a shuttle, and Rex provided only "legally irrelevant" evidence in response, the "jury lacked substantial evidence" to uphold the validity of claim 6. *Ariad*, 598 F.3d at 1355, 1358.

### C. The district court legally erred in denying judgment as a matter of law on this ground.

Notwithstanding the clear written-description problem with claim 6, the district court denied judgment as a matter of law on this ground. Appx331-333. Both of its reasons for doing so were flawed.

First, the district court misapprehended Intuitive's argument. It suggested that Intuitive was framing the relevant inquiry as "whether the specification provides an adequate description of the Accused Products," whereas the correct question is "whether the specification provides an adequate description of the claimed invention." Appx332. That misses the point. This Court has held that, to satisfy written description, the specification must demonstrate "that the inventors possessed the full scope of the claimed invention." *Juno*, 10 F.4th at 1336. If "the claimed invention" is broad enough to reach a beam-and-

65

shuttle configuration, then that is what the disclosure must support. *Cf. Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023) (enforcing this parallelism in the related context of enablement). Rex's enforcement of its patent monopoly against Intuitive depended on the inclusion of a shuttle where the patent discloses only a beam; that is the very problem that the written-description requirement seeks to avoid. *See, e.g.*, *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 121 (1853) (an inventor "can lawfully claim only what he has invented and described, and if he claims more his patent is void"); *ICU Med.*, 558 F.3d at 1377 (written-description requirement "protects the quid pro quo between inventors and the public").

Second, the district court legally erred by suggesting that the jury could rely exclusively on information outside the four corners of the '650 patent to support its written-description finding. *See* Appx333 (citing testimony that shuttles were known to persons of ordinary skill). As demonstrated above (Part II.A-B), that is incorrect as a matter of law. And the cases the district court cited to justify its ruling do not show otherwise. *See* Appx332-333. It is true that "an applicant is not required to describe in the specification every conceivable and possible

future embodiment of his invention." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) (cited at Appx332). But, as this Court has already explained, that principle does not change the fact that the specification's disclosure must be adequate to show that the inventor had possession of the full scope of the claims. *See, e.g.*, *Univ. of Rochester*, 358 F.3d at 922-923. Here, it is undisputed that nothing in the '650 patent even hints at a shuttle; a person of ordinary skill would have to modify the disclosure to incorporate one. *Supra* Part II.B.

The district court suggested that such modifications are permissible, citing *Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353 (Fed. Cir. 2011). *See* Appx333. This Court has already explained that *Boston Scientific* is "inapposite" where, as here, "nothing in the [asserted] patent disclosure indicates the possibility" of the configuration reached by the claims. *Rivera*, 857 F.3d at 1322. Furthermore, the Court in *Boston Scientific* itself held written description lacking based on the "four corners of the specification." 647 F.3d at 1366.

Under this Court's precedent, the disclosure of the '650 patent is legally insufficient to support a claim to a beam-and-shuttle

configuration.  And Rex's infringement theory indisputably turned on claim 6 encompassing such a configuration.  Upon upholding the jury's infringement verdict, therefore, the district court should have granted judgment as a matter of law that claim 6 is invalid under § 112(a).  If this Court does not reverse the judgment on infringement grounds, it should do so on grounds of invalidity.

## III.  Rex Failed to Prove Its Entitlement To Damages And Should Not Get A New Trial.

Even if the jury's verdict on infringement and validity stands, this Court should affirm the district court's remittitur of damages to $1.  Rex had the burden to prove the amount of "a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284; *see Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  That "use," according to the verdict, was the infringement of claim 6 of the '650 patent by Intuitive's SureForm products.  Instead of attempting to value that use, Rex took the position that, because Covidien paid $10 million as a settlement fee to license the '650 patent along with many others, Intuitive should pay $10 million in damages here.

Rex's damages expert, Mr. Kidder, conceded that he did not attempt to apportion the $10 million value of the Covidien license to the

'650 patent. And even after the district court precluded Mr. Kidder from testifying about the Covidien license because of that fatal flaw, Appx4-6, Rex doubled down on Mr. Kidder's theory. Its damages case at trial consisted of a single fact witness who had no knowledge about how to parse the '650 patent's value, whether through the Covidien license or otherwise. The district court rightly concluded that Rex's evidence "fail[ed] to provide anything more than an entirely speculative basis for assigning value to the asserted patent." Appx340. Importantly, Rex had other options for carrying its burden of proving damages, including through Mr. Kidder, but it chose not to use them. The district court properly held Rex to the consequences of its choices, refusing to afford "a second chance at discovery and trial" when Rex squandered its first chance. Appx340.

### A. The district court acted within its discretion by excluding Mr. Kidder's testimony on the Covidien license because he failed to apportion.

The district court did not abuse its discretion in "find[ing] that Mr. Kidder's methods in relying on the Covidien license are unreliable and must be excluded." Appx6. Rex argues otherwise, insisting that Mr. Kidder "employed a reliable methodology" by assessing the hypothetical

negotiation, that he "considered each of the fifteen *Georgia-Pacific* factors in significant detail," and that he has the proper credentials and relied on the proper sources. OB25-28. But no one disputes that Mr. Kidder invoked the right concepts and has appropriate qualifications. The issue is that, despite his resume, nothing in Mr. Kidder's "61-page expert report" (OB25) provided any basis on which a jury could apportion the $10 million lump sum that Covidien paid among the '650 patent, the '892 patent, and the dozens of other licensed patents and patent applications. *See* Appx5-6.

"[I]n every case," the patentee must "give evidence tending to separate or apportion … the patentee's damages between the patented features and the unpatented features[.]" *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963, 976 (Fed. Cir. 2023) (citation omitted). "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Although a patentee may rely on comparable licenses as a starting point in the reasonable-royalty analysis, "[p]rior licenses … are almost never perfectly analogous to the infringement

action." *Id.* at 1227. Because "allegedly comparable licenses may cover more patents than are at issue in the action, include cross-licensing terms, [or] cover foreign intellectual property rights," witnesses relying on prior licenses "must account for such distinguishing facts when invoking them to value the patented invention." *Id.*

Both parties' experts recognized the need to make such an accounting here. *See* Appx3854 (Mr. Kidder acknowledging that "some adjustment" was necessary from the "starting point" of the Covidien license's $10 million); Appx3083 (Mr. Schoettelkotte agreeing that the Covidien license provides "a reasonable starting point," but "adjustments are necessary"). But Mr. Kidder failed in multiple ways to make those necessary adjustments.

To start, Mr. Kidder focused entirely on the '650 and '892 patents and failed to account for the rest of the intellectual property licensed in the Covidien agreement. *See* Appx6. Covidien's $10 million license fee gave it rights to at least eight other U.S. patents, seven U.S. patent applications, 13 foreign patents, and six foreign patent applications owned by Rex. Appx12142. The license also included "all" of Rex's patents "relate[d] to surgical stapling" and covered a broad catchall

71

category of "any Patent that claims priority directly or indirectly from, or from which priority is directly or indirectly claimed by, or that has common priority with, any of the foregoing Patents." Appx12142. Mr. Kidder dismissed all of this as "likely account[ing] for little-to-no value to Covidien." Appx3854.

As the district court explained, that opinion was not reliable. Appx4-6. Although Mr. Kidder cited academic literature for the general proposition that patent values are often "highly skewed," Appx3848, he did nothing to investigate the potential value of the 34 other patents and applications expressly covered by the Covidien license. *See* Appx3474-3476. Mr. Kidder admitted, for example, that he did not "analyze" whether any of the other patents covered the same stapling innovations as the '650 and '892 patents or "cover[ed] any of Covidien's products." Appx3502-3503; *see* Appx6 (district court relying on this testimony). In fact, Mr. Kidder did not even look at those other patents—nor did Rex's technical expert. Appx3502-3503.

Nonetheless, Mr. Kidder concluded that everything else Rex licensed to Covidien amounted to junk tossed in for free. Appx3853-3854. That is precisely the type of opinion this Court has held should

72

be excluded for lacking apportionment. *See, e.g., MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373-74 (Fed. Cir. 2021). In *MLC*, the plaintiff's damages expert adopted the royalty rate from a prior settlement agreement "grant[ing] a license to a portfolio of forty-one U.S. and international patents and patent applications" and applied it, with no adjustment, to the hypothetical negotiation for the lone asserted patent claim. *Id.* at 1375. This Court "affirm[ed] the district court's *Daubert* order excluding MLC's expert testimony regarding a reasonable royalty for failure to apportion." *Id.*

Contrary to Rex's view, Mr. Kidder's similar failure to apportion here does not simply go to the weight of his testimony rather than its admissibility. *Contra* OB31-32. Disagreements with an expert's "conclusions" and the "considerations underlying those conclusions" are proper matters for cross-examination if the expert used a reliable methodology. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012). But Mr. Kidder used an unsound methodology here. Failing to apportion means that Mr. Kidder's opinion on the Covidien license lacked a fundamental ingredient necessary in every patent case. *See, e.g., MLC*, 10 F.4th at 1375; *Apple*

*Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973-74 (Fed. Cir. 2022); *SonicWall*, 84 F.4th at 975-77.

Rex also cannot save Mr. Kidder's opinion by citing his bare conclusion that, because Rex "asserted [only] the '892 Patent and the '650 Patent against Covidien and Intuitive," those two patents "have the most value to these two companies." Appx3853. Rex cites no authority for crediting such an opinion. *See* OB30-31. Nor does Rex acknowledge anywhere in its brief that, when Covidien entered its license, Rex had dropped the '650 patent and was asserting only the '892 patent against Covidien. *See* Appx12140-12154 (Covidien license entered in April 2020); Appx3575-3583 (Covidien's March 2020 invalidity contentions explaining that Rex "no longer asserted" the '650 patent). If an asserted patent has the "most value," then the '892 patent, not the '650 patent, would have been most valuable to Covidien.

But Mr. Kidder made no attempt to separate out the value of the '892 patent and the '650 patent in the Covidien license. *See* Appx5. Rex insists that Mr. Kidder did not need to do so, beyond opining "that the '650 and '892 patents covered the same general innovation, and therefore neither added significant incremental value to the other."

OB34. Even if that could satisfy the apportionment requirement, Mr. Kidder did not actually offer such an opinion in his report—as the district court recognized. Appx5. He instead said that "[m]ost of the [$10 million] value" of the Covidien license flowed from "*either* the '892 Patent or the '650 Patent." Appx3853 (emphasis added); *see* Appx3903-3904. And Mr. Kidder admitted in his deposition that he "didn't allocate the $10 [million] dollars at all between the '650 and '892 patent[s]." Appx3501; *see* Appx5.

Mr. Kidder therefore provided no reliable way for a jury to assess how much of the $10 million lump sum that Covidien paid was attributable to the '650 patent instead of the '892 patent. He also provided no basis for a jury to conclude that Intuitive would give the two patents the same relative value as Covidien. He effectively treated each patent as a Schrödinger's cat of damages, simultaneously worth (a) almost the entire $10 million value of the Covidien license and (b) next to nothing, with no guidance to a jury on how to resolve that quantum state for the hypothetical negotiation.

Mr. Kidder understood, for example, that Rex had dropped the '650 patent from its Covidien litigation by the time the license was

executed, and that Rex conversely dismissed the '892 patent with prejudice from this case years before trial. Appx3511; *see* Appx585-586. But he did not square these facts with his view that the '650 patent nonetheless might have provided all the value behind Covidien's $10 million payment, or that both Covidien and Intuitive would view the two patents as a functionally indistinguishable pair. His view that the '650 patent could account for most (or all) of the $10 million Covidien license was therefore "untethered to the facts of this case." *Apple*, 25 F.4th at 973.

Mr. Kidder's "silence" on such key facts "is troubling and makes his opinion unreliable." *Id.* at 974. In *Apple*, for example, this Court held that an expert's damages testimony "should have been excluded" where he "failed to address the extent to which" five of six asserted patents in a prior license had "contributed to the royalty rate" in that license. *Id.* at 973-74. He instead opined without explanation that omitting those other relevant patents "from the hypothetical negotiation would have netted Apple only a 25 percent discount." *Id.* at 973. Mr. Kidder's opinion here was even more extreme. He failed to address the fact that the '650 patent was not asserted against Covidien

at the time it took a license, yet he concluded that Intuitive would have paid *twice as much* for a single-patent license to the '650 patent as Covidien had paid for a license to the '892 patent, the '650 patent, and more than 30 other patents and applications.  Appx3849.

Rex is correct that "[t]here is no blanket rule of *quantitative* apportionment in every comparable license case."  OB33-34 (quoting *Bio-Rad Lab'ys v. 10X Genomics*, 967 F.3d 1353, 1376-77 (Fed. Cir. 2020)).  But Mr. Kidder provided *no* apportionment, quantitative or otherwise.  He did not, for example, offer the kind of built-in apportionment opinion at issue in *Bio-Rad*, 967 F.3d at 1376-77, and Rex does not argue built-in apportionment here.

Mr. Kidder also did not qualitatively address how Covidien or Intuitive might value the '650 and '892 patents.  He provided no rationale for why either one might be worth $1 or $9,999,999 (or somewhere in between) in the hypothetical negotiation.  The district court acted well within its discretion in excluding this unreliable opinion.

### B.    The district court correctly remitted damages to $1 because Rex failed to prove a greater royalty.

After trial, the district court properly remitted the damages award to a nominal $1 because the record provided "no evidence that would allow the jury … to ascertain the value of the '650 based on the Covidien license," and no other "basis for a factfinder to tie a dollar amount to the value of the '650 patent or support the $10,000,000 award." Appx338, 340.  Section 284 "does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020).  In particular, "a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory." *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017).  That is precisely what Rex did here.  After the district court made clear that Mr. Kidder's attempt to attribute all the value of the Covidien license fee to the '650 patent violated the apportionment requirement, Rex continued its "singular pursuit" of that invalid theory through a fact witness, Rex's President Lindsay Carter.

Like Mr. Kidder, Mr. Carter gave the jury little information about the Covidien license and no way to assign value to the '650 patent. Indeed, Mr. Carter knew almost nothing about the Covidien license, other than that it existed and Covidien paid $10 million for it. Appx11448-11450. Mr. Carter admitted that he "had no information about Covidien sales" and did not know of any "established royalty rate" for licensing the '650 patent's stapling technology. Appx11449; Appx11452-11453. And he confessed that he had no idea whether Covidien marketed stapler products in any other countries that would be covered by the foreign patents included in the license. Appx11466-11467. In fact, Mr. Carter conceded that he was "not sure" whether the Covidien license had any relevance to the damages analysis here. Appx11455. And when Intuitive's counsel asked Mr. Carter if a value could be assigned to the '650 patent, he responded: "Not by me." Appx11481.

Mr. Carter's testimony accordingly did not give the jury any way to "account for [the] distinguishing facts" of the Covidien license in valuing the '650 patent. *Ericsson*, 773 F.3d at 1227. As the district court put it, he "fail[ed] to provide any basis from which a factfinder

could assign any portion of the $10,000,000 to the '650 patent alone."
Appx339. At best, Mr. Carter gave the sort of testimony forbidden by
*Omega*. There, the patentee's president testified that it always "sought
the same licensing fee *regardless* of what patents were included or what
technology was covered." 13 F.4th at 1379. This Court held that
allowing such an opinion would "improperly permit" a patentee "to hide
behind its generic licensing arrangements to avoid the task of
apportionment." *Id.*

Here, Mr. Carter tried that same evasive maneuver. He testified
that, although Rex licensed an entire patent portfolio to Covidien,
"there were only two license[d] patents that were focused, the '650 and
the '892." Appx11464. Mr. Carter also failed to establish a link
between the license fee and Covidien's alleged use of any of the licensed
patents; he admitted that he had "no idea if Covidien agreed to [the]
$10 million figure based on the amount of its product sales."
Appx11478-11479. Rather, according to Mr. Carter, "we just came to a
negotiated agreement." Appx11479. In essence, Mr. Carter's position,
just like the patentee in *Omega*, was that Rex always licenses its

stapling patent portfolio for $10 million, no matter the circumstances. That is not apportionment. 13 F.4th at 1379.

Rex makes the bold claim that *Omega* "does not control" here because the facts are not identical. OB42 (arguing that Rex "did not rely on company policy to establish a reasonable royalty"). But *stare decisis* does not turn on minor factual differences. *Omega*'s precedential majority opinion provides binding law on apportionment, yet Rex tellingly cites the dissenting opinion throughout its brief—and labels the case "a 2-1 decision," as if that means future panels can disregard the majority's ruling. OB34, 38, 42. Rex understands, in other words, that Mr. Carter's testimony does not qualify as apportionment under the law as it is, so Rex relies on the law as Rex wishes it were.

Rex also argues that a reasonable jury could have concluded "that Intuitive would be willing to license the '650 patent for at least the amount that Covidien paid for its license" based solely on the fact that Rex asserted only the '650 and '892 patents against both Covidien and Intuitive. OB37. Again, at most this suggests that Covidien valued the two patents together at $10 million. It did not give the jury any way to distinguish the value of the '650 patent from that of the '892 patent.

Nor did it account for any differences between Covidien and Intuitive. Even if (contrary to all evidence) the $10 million lump sum were entirely attributable to the '650 patent, that would show that the patent was worth $10 million *to Covidien*. But the record is devoid of evidence from which the jury could translate that value into the patent's worth *to Intuitive*. Indeed, the settlement license provided coverage to Covidien for a two-year period (2016-2018) in which Covidien's surgical stapler was on the market, but Intuitive's SureForm product was not. *See* Appx11479-11480. And the record reflects that, even after Intuitive launched SureForm, Covidien retained a much higher market share. Appx11480. There is no basis, on this record, for a jury to conclude that Covidien and Intuitive would see the same value in the '650 patent. *See also* Appx11780 (district court: "I know you have the Covidien license, you have $650 million [in sales], I don't know, did Covidien have $5 billion in sales? How is the jury supposed to do anything with that?").

Nonetheless, Rex contends that this record shows that Intuitive "would be willing to pay *more* for a license to the '650 patent than what Covidien paid," because Covidien already had a "non-infringing 60mm

stapler on the market" in 2016, whereas Intuitive needed the '650

patent's technology to "expand its market reach."  OB38.  Again,

nothing in the record establishes what Covidien paid for the '650

patent, as opposed to what it paid for the '892 patent and every other

patent in its license combined.  Furthermore, Rex identifies no record

evidence (because there is none) showing how Intuitive might have

valued entering the market for 60mm staplers.  As the district court

recognized, Rex "fails to provide anything more than an entirely

speculative basis for assigning value to the asserted patent."  Appx340;

*see Promega*, 875 F.3d at 660 (damages cannot "be left to conjecture by

the jury" (citation omitted)).

Rex insists that "Covidien saw value in the '650 patent."  OB40.

But its only support for that argument comes from Mr. Carter's

testimony, and Mr. Carter's only support for his testimony was the fact

that Covidien paid $10 million for a license to at least 36 patents and

applications that included the '650 patent.  Appx11450.  Rex has no

evidence to show *how much value* (if any) Covidien saw in the '650

patent.  Rex also makes the inventive claim that the mere fact that it

"ultimately asserted only the '650 patent in this case" proves that the

patent has value.  OB40-41.  If that were true, patentees could

guarantee themselves large damages awards simply by asserting

worthless patents.  That is not the law.  *See, e.g.*, *TecSec*, 978 F.3d at

1291-92.

Rex also claims that "all of the foreign patents and most of the

other U.S. patents covered by the Covidien license had expired before

the license was executed."  OB37.  To be sure, Mr. Carter parroted that

hearsay on the stand, having heard it from the engineer "who handles

all of our patent portfolios at Rex."  Appx11461; Appx11458.  But he

later admitted that he had no personal knowledge about the expiration

dates.  *See* Appx11461-11462; Appx11465.  And the license also released

Covidien from liability for any past acts of infringement, *see* Appx12143,

so even expired patents could have provided value to Covidien.

Rex protests that the jury received "detailed instructions about

apportionment" and could not have "misunderstood its task" when it

concluded that Intuitive would have paid $10 million to license just the

'650 patent.  OB38-39 (relying on *Omega*'s dissenting opinion).  Rex is

correct that the law presumes that the jury followed instructions.

*Tyson v. Superintendent Houtzdale SCI*, 976 F.3d 382, 394 n.7 (3d Cir.

2020). But accurate instructions cannot substitute for adequate evidence. Here, the jury simply had no evidentiary foundation to which it could apply those instructions and parse the '650 patent's value, so it came up with the only number it heard at trial: an unsupportable $10 million pulled straight from the Covidien license with no contextual analysis.

In sum, the trial record lacked "the minimum quantum of evidence" necessary to support the jury's $10 million award, *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009) (citation omitted), so the district court correctly remitted the award to a nominal $1.

### C. The district court acted within its discretion by denying a new damages trial, given Rex's failure of proof and strategic choices.

After holding that Rex failed to prove a damages amount, the district court properly exercised its discretion to deny Rex a new trial for a second shot at doing so. Rex decided to kneecap its own damages case by sending Mr. Kidder home, rather than having him testify about any of the other material in his report—including the Boston Scientific license. It then tasked Mr. Carter—a fact witness who admitted that he

could not assign a value to the '650 patent—with proving damages, and had him commit the same failure to apportion that had led to the exclusion of Mr. Kidder's opinion on the Covidien license.  As the district court put it, Rex "chose to hinge its damages theory on the very license that the Court had already precluded its expert from testifying about."  Appx340 n.11.  And Rex chose not to supplement the barebones testimony about that license with anything else the jury could use to divine a reasonable royalty.  *See, e.g.*, Appx11792.  When a patentee "deliberately takes a risk" like this, "a district court does not abuse its discretion by declining to give that plaintiff multiple chances to correct deficiencies in … arguments or the record."  *Promega*, 875 F.3d at 666.

Nonetheless, along with pointing to Mr. Carter's deficient testimony, Rex contends that the Covidien license by itself justifies a non-zero royalty, since it shows that "a third party paid Rex Medical $10 million to license the '650 patent and several other patents."  OB45.  "Several other patents" is quite an understatement, as discussed above (at 71-72).  Standing alone, the Covidien license does not prove that the '650 patent merits a non-zero royalty from Intuitive any more than it

proves as much for the dozens of other licensed patents and applications that Rex insists are worthless.

Rex also argues that Intuitive's expert's damages opinion "underscores that the record does not support a zero royalty." OB45-46. But Mr. Schoettelkotte's opinion is not in the trial record, as Rex concedes. OB46. That is because Rex made the unusual choice not to depose him during discovery, then waited until trial was already underway—and four days after it learned that Mr. Kidder could not testify about the Covidien license—to seek permission to call Mr. Schoettelkotte in its own case. Appx11548-11550. The district court denied Rex's late-breaking request while noting that, "if the request had come in a more timely way," the court might have granted it. Appx11557. Rex identifies no authority that would let it escape its failure of proof at trial by pointing to a report from Intuitive's expert that the jury never saw.

With nothing in the record to support it, Rex leans heavily on the text of § 284. *See* OB20-21, 43-45, 49. But this Court has made clear that § 284 does not require a damages award—and thus, does not require a new trial here—if the patentee fails to prove any damages

"that adequately tie a dollar amount to the infringing acts." *TecSec*, 978 F.3d at 1291; *see also Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir. 2015) ("Where the patentee's proof is weak, the court may award nominal damages."); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1328 (Fed. Cir. 2014) ("[I]n a case completely lacking any evidence on which to base a damages award, the record may well support a zero royalty award."); *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 509-10 (Fed. Cir. 1990) (affirming award of no damages where "none were proven"); *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1407 (Fed. Cir. 1990) (Section 284's text "does not mean that a patentee who puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable' and therefore contravenes section 284."); *Devex Corp. v. Gen. Motors Corp.*, 667 F.2d 347, 363 (3d Cir. 1981) (Section 284 "requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of

any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute.").[4]

Rex cannot blame the district court's *Daubert* ruling for this situation. Rex claims that Mr. Kidder's opinion "relied exclusively on the Covidien license," so excluding his testimony on that license prevented him "from testifying at all." OB35, 47-48. That is incorrect. As the chart in Rex's own brief makes clear, Mr. Kidder provided a *Georgia-Pacific* analysis for both the Covidien license and the Boston Scientific license. OB8; *see supra* 27. Although Mr. Kidder believed that the Covidien license provided the "best evidence of a reasonable royalty," Appx3895, he also relied on the Boston Scientific license and contended that Mr. Schoettelkotte wrongly disregarded that license, Appx3899; *see* Appx3854-3856; Appx3865-3887. There is no rule requiring a damages expert to testify about only the "most comparable" license. Indeed, many cases involve expert testimony about multiple comparable licenses. *E.g.*, *Bio-Rad*, 967 F.3d at 1374; *VirnetX, Inc. v.*

---

[4] Therefore, Rex is incorrect that this Court should exercise plenary review over the denial of a new trial. *See* OB43. The district court followed binding precedent and did not misapply § 284. Appx337-341.

*Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014); *ActiveVideo*, 694
F.3d at 1333.

To be sure, Intuitive argued at trial that the district court should
exclude the Boston Scientific license.  Appx11303-11304.  But Intuitive
did so because Mr. Carter—the only witness Rex chose to offer on
damages—played no role in negotiating that license, did not know
whether it was comparable, and had no information about how the
parties reached the six-percent royalty rate.  Appx11304-11306.  Thus,
although the district court rejected Intuitive's argument and allowed
Rex to introduce the Boston Scientific license, Appx11444, the court
instructed Rex to redact the royalty rate because it would "unduly
prejudic[e]" Intuitive, Appx11307.  As the court explained:  "[I]t's [for]
an entire patent portfolio and [Mr. Carter] can't get up there and testify
anything about how much of that is relevant to the patent at issue."
Appx11308; *see* Appx12436.  Mr. Kidder, however, would have had no
such issue and could have told the jury the royalty rate and how he
believed they should adjust it here.

Rex does not even try to explain why it did not have Mr. Kidder
testify about the Boston Scientific license.  The district court did not bar

Mr. Kidder from testifying entirely. Appx337. In fact, it denied Intuitive's pretrial motion in limine on the Boston Scientific license. Appx3; *see* Appx9163. The court also made clear that Mr. Kidder could testify about topics other than the Covidien license: "I did not wholesale preclude [Mr. Kidder] from testifying and if he has additional testimony that is relevant to damages, he may give it. If plaintiff chooses not to call Mr. Kidder and put on any additional testimony to the extent it exists, that is plaintiff's choice." Appx11556; *see also* Appx11287 ("Just because I Daubert on one issue doesn't mean they can't put on a damages case."). For whatever reason, Rex made that strategic choice to drop Mr. Kidder from its trial presentation. Rex's displeasure with the consequences of its choice does not justify a second trial.

Rex closes by arguing that the district court should not have relied on *Promega* because it represents an "unusual case" and "is the exception, not the rule." OB50; *see* Appx340 ("[A] district court does not abuse its discretion by declining to give [a] plaintiff multiple chances to correct deficiencies in its argument or the record." (quoting *Promega*, 875 F.3d at 666)). *Promega* involved a different kind of oddity than this case; the patentee sought only lost profits (without presenting any

expert testimony on damages) and declared: "Royalties? Don't want them," before appealing to seek a new trial on a different damages theory. 875 F.3d at 660, 662, 665. But this case is unusual, too: Rex chose not to present any expert testimony on damages, abandoning everything in its expert report that the district court declared to be fair game and instead hinging its case on a fact witness who admitted that he could not assign any value to the '650 patent and testified only to the same unapportioned damages theory that the district court had already excluded. While a nominal damages award may be an exception, this case presents exceptional circumstances. The district court acted well within its discretion in recognizing that fact.

## CONCLUSION

The Court should reverse the denial of judgment as a matter of law, either on non-infringement or invalidity grounds. Alternatively, this Court should affirm the judgment awarding Rex $1 in damages.

Respectfully submitted,

/s/ *Melanie L. Bostwick*

|  |  |
|---|---|
| George Lombardi | Melanie L. Bostwick |
| WINSTON & STRAWN LLP | Samantha M. Leff |
| 35 W. Wacker Dr. | ORRICK, HERRINGTON & |
| Chicago, IL  60601 | SUTCLIFFE LLP |
|  | 2100 Pennsylvania Avenue NW |
| Michael R. Rueckheim | Washington, DC  20037 |
| WINSTON & STRAWN LLP | (202) 339-8400 |
| 255 Shoreline Drive, Suite 520 |  |
| Redwood City, CA  94065 | E. Joshua Rosenkranz |
|  | ORRICK, HERRINGTON & |
| Claire Fundakowski | SUTCLIFFE LLP |
| WINSTON & STRAWN LLP | 51 West 52nd Street |
| 1901 L Street, NW | New York, NY  10019 |
| Washington, DC  20036 |  |
|  | Lauren A. Weber |
|  | ORRICK, HERRINGTON & |
|  | SUTCLIFFE LLP |
|  | 401 Union Street, Suite 3300 |
|  | Seattle, WA  98101 |

*Counsel for Defendants-Cross-Appellants*

April 1, 2024

# CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 28.1(b)(2) because this brief contains 16,446 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Melanie L. Bostwick*
Melanie L. Bostwick
*Counsel for Defendants-Cross-Appellants*